UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| STEVEN ORTIZ, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:15-cv-04019-SLD-JEH |
| STATE OF ILLINOIS, DEPARTMENT OF EMPLOYMENT SECURITY, BY DIRECTOR JAY ROWELL, | ) |
| Defendant. | ) |

ORDER

Before the Court is Defendant State of Illinois Department of Employment Security's ("IDES") motion for summary judgment, ECF No. 15. For the following reasons, the motion is GRANTED and Ortiz's case DISMISSED.

**BACKGROUND**[1]

Ortiz started working at a call center in Rock Island, Illinois in 2012. The call center was run by IDES to answer questions about unemployment insurance benefits provided by the State of Illinois. Ortiz had non-Hodgkin's lymphoma, a form of cancer, and was receiving chemotherapy every other month. Side effects of the chemotherapy included inability to concentrate, night sweats, nausea, lethargy, intense fatigue, and chills.

---

[1] At summary judgment, a court "constru[es] the record in the light most favorable to the nonmovant and avoid[s] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The facts related here are taken from IDES's undisputed material facts, Mem. Supp. Mot. Summ. J. 2–10, ECF No. 16, and from the exhibits thereto. Where they are taken from elsewhere, or from specific exhibits to the motion, the source is cited. The Court will construe the facts in the light most favorable to Ortiz, but will not construe factual disputes in his favor, there being no factual disputes. Ortiz did not file a response to the motion for summary judgment.

When Ortiz originally applied for the job at the IDES call center, he was already employed by the Illinois Department of Human Services, a separate agency. On July 10, 2012, the call center interviewed him, along with eleven other candidates, for the position of Employment Security Program Representative. Representatives answer questions over the phone about unemployment insurance. The candidates were interviewed by IDES employees Rebecca Golden and Susan Colloton. Of the candidates, Ortiz scored third-highest on an application test. He was offered a position.

Ortiz accepted and began working at the call center on August 16, 2012. Around this time, he took an employment intake survey stating that he had no disabilities. Ortiz had accrued benefit time, vacation, and sick time while working at the Illinois Department of Human Services, and this time transferred with him to his new job. He also had access to Veteran's Leave, which permitted him to take time off to go to a Veteran's Hospital. He requested leave so that he could go to oncology appointments on August 20, October 22, and December 17, 2012. These requests were all approved by Golden, his supervisor. He told her that he was asking for leave to go to chemotherapy appointments, and asked her if he should submit proof of the appointments, to which she replied that he should.

Because Ortiz and the other new employees had been hired from an "open competitive eligible list," IDES regarded them all as being on probation for the first six months of their employment. 80 Ill. Admin. Code § 302.300(a). All the probationary employees were evaluated in writing at the end of the third month of the probationary period, and again fifteen days before the end of the probationary period, pursuant to law. *Id.* § 302.270(b). Golden, who was responsible for evaluating all of the call center employees, recommended whether to keep

probationary employees on after the end of the six-month period, although she did not have final authority to discharge them.

Golden's three-month evaluation of Ortiz indicates that he exceeded "objectives" for businesslike and professional conduct, and met all of them with respect to providing service, attending and completing training, working with his supervisor and coworkers, and being logged into the call center's phone relay system for seven and a half hours a day and answering 65–70 calls per day. First Ortiz Eval. 2, Mot. Summ. J. Ex. 1-E, ECF No. 16-1. It also indicates that he met expectations with respect to job knowledge, productivity, quality, initiative, use of time, planning, and follow-up, and that he exceeded them with respect to human relations. *Id.* Ortiz was also invited to evaluate himself on the same metrics in this second section. He indicated that he met expectations with respect to everything but job knowledge, where he said he needed improvement. The evaluation contained a narrative section written by Golden, describing Ortiz's training so far, and saying that initially, he had lacked confidence while speaking on the phone, but had improved in this area, and had good communication skills. Ortiz was invited to write a response, in which he stated that the assessment of him by Golden was accurate, that he had "a lot to learn," and that he appreciated the training and patience he'd received from the call center staff. *Id.* Golden states that at this time, she "thought he had some promise and wanted to give him more time to learn how to do the job." Golden Aff. ¶ 11, Mot. Summ. J. Ex. 1, ECF No. 16-1.

In November 2012, Ortiz asked Golden for more training, saying that he needed it because of his health, and his fatigue, and because there was so much to learn. Ortiz Dep. 74:10–12. Golden agreed to provide such training. From then on, Ortiz worked one on one with a more senior employee, Mike Timler. *Id.* 74:17–21. However, Golden told Ortiz on January

14, 2013 that she "could not recommend him to pass probation." Golden Aff. ¶ 12. At some point then or shortly thereafter, his employment was terminated.

Golden's second and final written evaluation for Ortiz indicates that he now no longer "met objectives" with respect to businesslike and professional conduct, providing service, working with his supervisor and coworkers, and being logged in and answering enough calls per day. Second Ortiz Eval. 2, Mot. Summ. J. Ex. 1-F, ECF No. 16-1. He continued to "meet objectives" only with respect to attending training. *Id.* He now did not meet expectations with respect to any category, in Golden's estimation; in his own, he again met expectations in every category except job knowledge. *Id.* In the narrative section, Golden wrote that the call center work was based on "the understanding of the claims process, IBIS functions and the ability to give the claimants the correct information," and that Ortiz's performance was unacceptable because "he has failed to grasp the basic functions of an employee of comparable training and time on the job. After considerable training, his performance does not exhibit the knowledge of department guidelines and procedures necessary to adequately perform the job." *Id.* at 3. In response, Ortiz asked his supervisors to keep in mind that he was receiving chemotherapy, and that during the weeks of infusion, he was "extremely ill and lethargic." *Id.* at 4.

Ortiz's probationary period would have ended on February 15, 2013, but Golden avers that she did not think he would be able to improve enough in this time period. Golden Aff. ¶ 14. She avers that she recommended he not pass the probationary period because of his inadequate job performance, not because of his non-Hodgkins lymphoma. *Id.* ¶ 15. She stated that she formed her conclusions on the basis of her personal observations, and speaking with Timler. *Id.* ¶ 17. Golden recommended that another of the employees who had been hired on probation at the same time as Ortiz, Allison Bradley, pass probation. Bradley had indicated that she had a

4

disability (IDES does not say what). Another employee who had been hired on probation at the same time as Ortiz, Tracy Hopkins, was also not permitted to pass probation.

Ortiz filed suit in Illinois circuit court on January 22, 2015, alleging discrimination under the ADA, Compl. 2–4, Not. Removal Ex.3, ECF No. 1-3, and sex discrimination under Title VII, 42 U.S.C. §§ 2000e–2000e–17, Compl. 4–5. IDES removed the case to this Court on February 27, 2015, pursuant to 28 U.S.C. §§ 1441, 1446, and the Court's federal-question jurisdiction. Not. Removal, ECF No. 1. After a motion to dismiss, ECF No. 2, was granted, Mar. 30, 2016 Order, ECF No. 14, removing the Title VII claim, IDES moved for summary judgment on May 3, 2016. Ortiz never responded to this motion, which is ripe for ruling.

## DISCUSSION

### I. Legal Standard on a Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). "However, neither 'the mere existence of *some* alleged factual dispute between the parties,' nor the existence of 'some metaphysical doubt as to the material facts,' is sufficient to defeat a [properly supported] motion for summary judgment." *Hoffman v. MCA, Inc.*, 144 F.3d

5

1117, 1121 (7th Cir. 1998) (quoting *Anderson*, 477 U.S. at 247, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (citations omitted). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir.1999) (quoting *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994)).

**II.     Analysis**

Ortiz has not responded to IDES's motion for summary judgment. A failure to respond to a motion for summary judgment will be deemed an admission of the motion. C.D. Ill. L.R. 7.1(D)(2); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."). By failing to respond, Ortiz has acceded to IDES's version of the facts. *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 286 (7th Cir. 1997).

IDES argues the Ortiz's ADA claim fails because he cannot show evidence from which a jury could infer IDES's discriminatory intent in declining to keep Ortiz on past the end of his probationary period, Mem. Supp. Mot. Summ. J. 11–14; and because he cannot make out a prima facie case under the indirect method of proof because he cannot show that he was meeting his employer's legitimate job expectations, *id.* at 14–16. He further argues that even if Ortiz can make out a prima facie case, he cannot show that IDES's offered reason for his termination is pretextual. *Id.* at 16–18.

The ADA prohibits discrimination against disabled employees because of their disability. 42 U.S.C. § 12112(a). A person with a disability under the ADA must "(A) [have] a physical or mental impairment that substantially limits one or more [of his] major life activities . . . ; (B) [have] a record of such an impairment; or (C) [be] regarded as having such an impairment . . . ."

*Id.* § 12102(1). To bring an ADA claim, a disabled person must have suffered an adverse employment action, like termination. *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001). Disabled plaintiffs may show discrimination by using either the direct or indirect method of proof. *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

Direct evidence is evidence of discrimination is evidence that, taken as a whole, would permit a reasonable jury to infer that discrimination was the reason for termination, and can include direct statements of discriminatory intent, ambiguous statements, suspicious timing, evidence that nondisabled employees received systematically better treatment, or evidence that an offered reason for termination was pretextual. *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011); *see Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016) (holding in the Title VII context that under the direct method, there are not two separate "piles" of evidence for direct and circumstantial evidence, but rather that "all evidence belongs in a single pile and must be evaluated as a whole"). A plaintiff lacking direct evidence of discrimination may still show discrimination under the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Such a plaintiff must first make out a prima facie case: that "(1) he is disabled under the ADA, (2) he was meeting his employer's legitimate employment expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees without a disability were treated more favorably." *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009). If he does so, the burden shifts to the defendant to provide "a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* If the defendant does so, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the offered reason is pretextual. *Id.* The shifted burden is one of production; the

burden of persuasion remains with the plaintiff at all times. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 685 (7th Cir. 2014).

Because Ortiz has not argued that he can survive summary judgment under either method, and because IDES argues that it is entitled to summary judgment under both, the Court will analyze his claim under both methods.

### i. Direct Method

IDES concedes that Ortiz is a qualified individual with a disability; his termination clearly qualifies as an adverse employment action. However, IDES argues that there is insufficient evidence to show directly that Ortiz was terminated because of his non-Hodgkins lymphoma. Mem. Supp. Mot. Summ. J. 11–14. Puzzlingly, IDES appears to concede that symptoms of Ortiz's chemotherapy caused the poor work performance for which he was fired. *Id.* at 12 ("In fact, it is undisputed that Plaintiff's lack of concentration and memory were caused by the chemotherapy treatment he was receiving for his non-Hodgkin's Lymphoma, and it was these side effects of treatment that caused his poor work performance."). IDES argues that termination for this poor performance, viewed as a consequence of Ortiz's condition rather than a symptom of his disability, does not count as termination because of disability under the rule of *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1197–98 (7th Cir. 1997).

But the Court need not even go this far to see that there is insufficient evidence in the record from which a jury could infer discrimination. Golden stated, and wrote in her second evaluation, that she had refused to keep Ortiz on past the end of his probationary period not because of his disability, but because "he has failed to grasp the basic functions of an employee of comparable training and time on the job. After considerable training, his performance does not exhibit the knowledge of department guidelines and procedures necessary to adequately

8

perform the job." Second Ortiz Eval. 3. In Golden's view, he did not grasp the "basic functions" of the job. While he had missed three days because of chemotherapy, and had been "extremely ill and lethargic," *id.* at 4, afterward, Golden did not recommend him for permanent employment because in her view did not possess the basic knowledge necessary to do the job, and would not be able to acquire it in the month remaining before the end of the probationary period. *Id.* at 3; Golden Dep. ¶¶ 14, 16. Ortiz had sought out extra supervision and received extra training, but, with one sixth of his probationary period remaining, Golden was certain that he would not be able to be trained to do the job. This certainty, in her telling, had nothing to do with his ability to appear for work—indeed, even in her second evaluation, she stated that he was still "meeting objectives" with respect to attending training—and everything to do with his capacity to understand the job. Ortiz offered no evidence suggesting that he was unable to prepare or train for the job. Simply put, the evidence is not that side effects from chemotherapy caused Ortiz's poor performance. Rather, there is insufficient evidence from which to conclude that anyone other than Ortiz himself was responsible for his inability to meet Golden and IDES's expectations. While, with more or other evidence, a jury might be able to infer that his inability to grasp the basic functions of the job has been caused by his lethargy or illness while attending the extra training he had requested, he never alleges it, and provides no evidence to show it, as he must at this phase.

In addition, the fact that Bradley, who had a disability, was hired at the end of the probationary period, and Hoskins, who did not, was also not retained, suggest further that IDES did not have a discriminatory motive in firing Ortiz. No reasonable jury could conclude from the evidence before the Court that Ortiz was fired because of his disability.

    **ii.**    **Indirect Method**

9

IDES argues that even proceeding under the indirect method, Ortiz's claim fails because he cannot make out the second element of his prima facie case: that he was meeting his employer's legitimate job expectations. IDES is correct. It is surely legitimate for an employer who runs a call center answering questions about unemployment claims to expect that its employees possess "a basic understanding of the unemployment insurance claims process . . . ." Golden Aff. ¶ 16. Ortiz did not possess this, in Golden's and Timler's opinion, which they formed on the basis of multiple months' observation and supervision. Furthermore, Golden indicated in her second evaluation that Ortiz was failing to meet both "objectives" and expectations (whatever the difference between the two in this setting may be) in almost every way. Ortiz has offered no evidence to refute this evaluation except his statement, recorded at the time, that Golden's assessment was "heavy exag[g]eration!" Second Ortiz Eval. 4. Ortiz cannot show that he was meeting IDES's legitimate job expectations, so his prima facie case fails.

Even if it did not, IDES's offered reason for Ortiz's termination is nondiscriminatory, and nothing (least of all Ortiz) suggests that it is pretextual. It is admittedly odd, or at least facially inconsistent, that despite Ortiz's not apparently achieving any different proficiency at his job between the first and second evaluations, Golden marked him as failing to meet expectations in all of the categories in his evaluation where she had previously described him as meeting expectations. But this pattern is consistent with her statement that she "wanted to give him more time to learn how to do the job." Golden Aff. ¶ 11. Furthermore, IDES knew about Ortiz's condition before the first evaluation was filed, so, barring some implausible and long-brewing scheme to terminate him at the second evaluation by way of facially inconsistent assessments, there is no likelihood that the inconsistencies reveal pretext. Ortiz's claim fails on the indirect method.

Because Ortiz cannot show discrimination under either direct or indirect methods to a level sufficient to survive summary judgment, his claim must be dismissed.

## CONCLUSION

Accordingly, Defendant's motion for summary judgment, ECF No. 15, is GRANTED, and Plaintiff's ADA claim DISMISSED. No further claims remaining, the Clerk is directed to enter judgment and close the case.

Entered this 28th day of March, 2017.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE
